1   JUDITH STARR
    General Counsel
2   CHARLES L. FINKE
    Deputy General Counsel
3   JOEL W. RUDERMAN
    KENNETH J. COOPER
4   Assistant General Counsel
    MARK R. SNYDER (CA 109430)
5   MARY A. PETROVIC
    JORDAN E. JACOBSON (CA 302543)
6   Attorneys
    PENSION BENEFIT GUARANTY CORPORATION
7   1200 K Street, N.W.
    Washington, D.C. 20005-4026
8   Tel.: (202) 326-4020, ext. 6511
    Fax: (202) 326-4112
9   Email: jacobson.jordan@pbgc.gov *and*
            efile@pbgc.gov;

10

11  Attorneys for Pension Benefit Guaranty Corporation

12          **UNITED STATES DISTRICT COURT**

13          **CENTRAL DISTRICT OF CALIFORNIA**

14              **SOUTHERN DIVISION**

15  _____

16  PENSION BENEFIT GUARANTY
    CORPORATION, as statutory trustee of
17  The Retirement Plan of Freedom
    Communications, Inc.,
18

19                      Plaintiff,

20

21  ERIC SPITZ
    225 19th Street
22  Newport Beach, CA 92663

23  AARON KUSHNER
    396 Washington Street, #307
24  Wellesley, MA 02481

25  RICHARD J. COVELLI
    16701 Jetton Road
26  Cornelius, NC 28031

27  TRACI M. CHRISTIAN
    5008 W. 129th Street
28  Leawood, KS 66209

Civil Action No.: 8:19-cv-00299

**COMPLAINT FOR:**
**(1) BREACH OF FIDUCIARY**
**DUTIES IN VIOLATION OF**
**ERISA, (2) ENGAGING IN**
**PROHIBITED TRANSACTIONS**
**IN VIOLATION OF ERISA, AND**
**(3) KNOWING PARTICIPATION**
**IN BREACH OF FIDUCIARY**
**DUTIES IN VIOLATION OF ERISA**

JTR, LLC
814 Tyvola Road, Suite 107
Charlotte, NC 28217

C&C MARKETING LLC
814 Tyvola Road, Suite 107
Charlotte, NC 28217

C2 ADVISORS, LLC
814 Tyvola Road, Suite 107
Charlotte, NC 28217

ETAROS ACTUARIAL SERVICES, LLC
5008 W. 129th Street
Leawood, KS 66209

Defendants.

The Pension Benefit Guaranty Corporation ("PBGC") brings this complaint (the "Complaint") as statutory trustee of the Retirement Plan of Freedom Communications, Inc. (the "Pension Plan") against Aaron Kushner ("Kushner"), Eric Spitz ("Spitz"), Richard J. Covelli ("Covelli"), Traci M. Christian ("Christian"), JTR, LLC ("JTR"), C & C Marketing LLC ("C & C"), C2 Advisors, LLC ("C2"), and Etaros Actuarial Services LLC ("Etaros") (collectively, the "Defendants"), and alleges as follows on information and belief:

### JURISDICTION & VENUE

1.      PBGC brings this action under 29 U.S.C. §§ 1132, 1303(e), and 1342(d).

2.      The United States District Court for the Central District of California (the "Court") has jurisdiction over this action, without regard to the amount in controversy, pursuant to 29 U.S.C. §§ 1132(e)(1), (f) and 1303(e)(3).

3.      Venue properly lies in this Court under 29 U.S.C. §§ 1132(e)(2), 1303(e)(2) because many of the acts giving rise to the alleged ERISA violations took place in this district.

### INTRODUCTION

4.      The Pension Plan is a single-employer defined benefit pension plan covered by the pension plan termination insurance program established under Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1301 – 1461 (2012 & Supp. IV 2016).   Freedom Communications, Inc. ("Freedom") was the sponsor of the Pension Plan, which

provided retirement benefits to certain employees of Freedom and its affiliates. The Pension Plan terminated under ERISA during the bankruptcy reorganization proceedings of Freedom and its affiliates.[1] PBGC then became the statutory trustee of the Pension Plan. PBGC brings this action on behalf of the Pension Plan to recover losses suffered by the Pension Plan attributable to (a) breaches of fiduciary duties under ERISA, including the duties of loyalty, prudence, and adherence to plan documents (collectively, the "Fiduciary Standards"), 29 U.S.C. §§ 1104(a)(1)(A) - (D); (b) transactions prohibited by ERISA ("Prohibited Transactions"), 29 U.S.C. § 1106(a); and (c) knowing participation in breaches of fiduciary duties ("Knowing Participation"), 29 U.S.C. § 1132(a)(3).

5.      In 2012, Kushner and Spitz acquired Freedom. The company was in the media and information business. The Pension Plan was substantially underfunded at the time of the acquisition, and assumption of the Pension Plan was part of the consideration.

6.      Kushner and Spitz wanted to improve the funding status of the Pension Plan to reduce the funding contributions required by ERISA. With that aim, rather than maintaining prudent investments with sound economic substance, Kushner and Spitz caused the Pension Plan to make four ill-advised, highly speculative investments which caused the Pension Plan to lose tens of millions of dollars

7.      One of the failed investments started when Covelli and his associate, Larry P. Chinn ("Chinn"), approached Kushner and Spitz with a proposal which they claimed would instantly improve the Pension Plan's funding status. Under this program, which Kushner and Spitz implemented, the Pension Plan purchased life insurance policies with Freedom employees as the insureds. Christian, the actuary retained and compensated by Covelli, then inflated the value of the policies by valuing them at the net present value of future death benefits, rather than using the correct valuation method, the cash surrender value of the policies. Kushner and Spitz abandoned the program when they realized that the Pension Plan was legally required to use the cash surrender value, resulting in a loss to the Pension Plan of over $7 million dollars.

---

[1] In November 2015, Freedom and certain of its affiliates commenced cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). These cases are being jointly administered as *In re Freedom Communications, Inc., et al.*, Case No. 15-15311-MW (the "Bankruptcy Case"), and are pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court").

8.      In spite of this debacle, Covelli managed to convince Spitz and Kushner to invest Pension Plan money in another life insurance scheme.  This time it involved a complex program where the Pension Plan purchased a portfolio of loans used to finance life insurance premiums for people unrelated to Freedom or the Pension Plan.  Although such portfolios can have economic value when the insured persons are in poor health with decreased life expectancies, Covelli failed to obtain the medical information needed to make a meaningful evaluation.  Rather than acquiring a valuable asset, Defendants acquired a program with no market value.  And Defendants lost millions of dollars of Pension Plan assets.

9.      In addition to the investments in the life insurance programs, Kushner and Spitz lost millions of dollars of the Pension Plan assets by investing in a highly speculative and unproven foreign hedge fund.  The hedge fund is now worthless.

10.     Finally, Kushner and Spitz lost millions of dollars of Pension Plan assets by causing the Pension Plan to buy stock in Freedom when they knew that the company was in financial distress.  The stock is now worthless.

11.     Kushner and Spitz failed to act prudently in causing all four of these investments.  They also put their own interests and the interests of Freedom ahead of the interests of the Pension Plan's participants and their beneficiaries (the "Participants and Beneficiaries").  Kushner and Spitz failed to act in accordance with the Pension Plan's investment policy when they authorized the life insurance programs.  Covelli profited handsomely at the Pension Plan's expense by participating in the life insurance investments.  As discussed below, the Defendants violated ERISA.  PBGC, on behalf of the Pension Plan, seeks to recover the Pension Plan's losses and obtain other relief.

## PARTIES

12.     Plaintiff PBGC is a wholly owned United States government corporation and an agency of the United States established to administer and enforce the defined benefit pension plan termination insurance program under Title IV of ERISA.  29 U.S.C. § 1302(a).  PBGC guarantees the payment of certain pension benefits upon the termination of pension plans covered by Title IV of ERISA.  29 U.S.C. §§ 1321, 1322, 1361.  When an underfunded pension plan terminates, PBGC generally becomes the statutory trustee of the plan and pays all guaranteed retirement benefits, up to statutory limits. 29 U.S.C. §§ 1321-1322, 1342, 1361.

13.     Defendant Aaron Kushner is an individual residing in Massachusetts.

14.     Defendant Eric Spitz is an individual residing in California.

15.     Defendant Richard J. Covelli is an individual residing in North Carolina.

16.     Defendant Traci M. Christian is an individual residing in Kansas.

17.     Defendants JTR, LLC, C & C Marketing, LLC, and C2 Advisors, LLC (each, a "Covelli Entity" and collectively, the "Covelli Entities") are each Delaware limited liability companies with principal places of business located at 814 Tyvola Road, Suite 107, Charlotte, North Carolina 28217.  Covelli is, and at all times relevant to this action was, the Managing Member of each Covelli Entity.

18.     Defendant Etaros Actuarial Services, LLC, is a Kansas limited liability company with a principal place of business located at 5008 W. 129th Street, Leawood, Kansas 66209.  Christian is, and at all times relevant to this action was, the Managing Member of Etaros.

**GENERAL ALLEGATIONS**

**ERISA Definitions & Standards**

19.     Under ERISA, a fiduciary of an employee benefit plan ("Fiduciary") includes any person who exercises discretionary authority or discretionary control respecting the management of the plan or exercises any authority or control respecting the management or disposition of its assets. 29 U.S.C. § 1002(21)(A).  A Fiduciary also includes anyone who renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan or has any authority to do so.  *Id.*  In addition to this functional definition of a fiduciary, ERISA requires pension plans to have one or more named fiduciaries.  29 U.S.C. § 1102(a).  A named fiduciary is a fiduciary named in the plan instrument.  *Id.*

20.     Under ERISA, a Fiduciary shall discharge his duties with respect to the plan:

solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries [the "Duty of Loyalty"] . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ["Due Diligence" and the "Duty of

Prudence"] . . . in accordance with the documents and instruments governing the plan . . . [the "Duty to Act in Accordance with Plan Documents"].

29 U.S.C. §§ 1104(a)(1)(A)-(D).   Under ERISA, a "Party in Interest" in relation to an employee benefit plan includes "a person providing services to such plan," 29 U.S.C. § 1002(14)(B).

21.     Under ERISA, a transaction is a "Prohibited Transaction" if, among other things, it constitutes a direct or indirect "furnishing of goods, services, or facilities between the plan and a [P]arty in [I]nterest," 29 U.S.C. § 1106(a)(1)(C).

### The Pension Plan

22.     The Pension Plan was established by Freedom effective January 1, 1989.

23.     Before commencing its bankruptcy proceeding in November 2015, Freedom and its affiliates owned The Orange County Register, The Riverside Press-Enterprise, and other Southern California newspapers and magazines.

24.     Freedom maintained the Pension Plan to provide retirement benefits for employees of Freedom and its affiliates.

25.     The Pension Plan was an employee benefit pension plan within the meaning of 29 U.S.C. § 1002(2).  A copy of the Pension Plan's written instrument is attached hereto as Exhibit 1 (the "Plan Document").

26.     Under ERISA, the Pension Plan's administrator was required to prepare an annual report containing, along with other information, the current value of the Pension Plan's assets (the "Annual Report").  29 U.S.C. § 1023.

27.     Under ERISA, Freedom was required to make minimum funding contributions to the Pension Plan (the "Minimum Funding Obligations"), 29 U.S.C. §§ 1082, 1083, in amounts based in part on the combined fair market value of assets contained in the previous year's Annual Report. *See* 29 CFR 4010.4(b).

### Freedom, Pre-bankruptcy

28.     On April 30, 2010, Freedom and its affiliates emerged from a Chapter 11 bankruptcy filed in the United States Bankruptcy Court for the District of Delaware, jointly administered as *In re Freedom Communications Holdings, Inc.*, Case No. 09-13046 (Bankr. D. Del.).

– 6 –

29.     In 2012, Kushner and Spitz acquired Freedom and its affiliates for approximately $50 million and the assumption of liabilities, including liability for the underfunding of the Pension Plan.

30.     Beginning in 2012, Kushner held various executive positions with Freedom and its affiliates, including as Freedom's chief executive officer and the chairman of its board of directors, and the chairman of the board of directors of Freedom's sole shareholder and ultimate corporate parent, 2100 Freedom, Inc. ("2100").   At all relevant times to the allegations in this Complaint, Kushner and Spitz co-owned 2100.  A Kushner-affiliated entity owned approximately 90% of 2100's stock.  *See* Summary of Assets and Liabilities of 2100 Freedom, Inc. at 76, *In re 2100 Freedom, Inc.*, No. 15-15315 (Bankr. C. D. Cal. Dec. 21, 2015), ECF No. 16.

31.     Beginning in 2012, Kushner was a member of the Pension Plan's administrative committee (the "Administrative Committee"), which had exclusive authority to control and manage the Pension Plan's operations and administration, and he was a member of the Pension Plan's investment committee (the "Investment Committee"), which had exclusive authority to control and manage the investment of the Pension Plan's assets.   Under the Plan Document, members of the Administrative Committee and the Investment Committee were the named Fiduciaries of the Pension Plan.  Ex. 1. Plan Document § 11.01(d); 29 U.S.C. § 1102(a)(1).

32.     Beginning in 2012, Spitz held various executive roles with Freedom and its affiliates, including as Freedom's president.

33.     Beginning in 2012, Spitz was a member of the Administrative Committee and the Investment Committee.

34.     Beginning in 2012, Kushner and Spitz were trustees of the Pension Plan.

35.     Kushner and Spitz, as members of the Administrative and Investment Committees, and as trustees of the Pension Plan, each had access to the professional opinions of various pension advisory, accounting, and actuarial firms retained by Freedom, including the firms of LTSP, Inc., Towers Watson & Co., and Aon Hewitt.

36.     Effective July 29, 2013, Freedom and Aon Hewitt entered into an agreement (the "Aon Hewitt Master Consulting Agreement") under which Aon Hewitt agreed to provide investment consulting and management advice to the Pension Plan.   As part of the Aon Hewitt Master

Consulting Agreement, Freedom designated Aon Hewitt as a Fiduciary of the Pension Plan in connection with certain investment consulting actions.

37.    In 2012, Kushner and Spitz together began implementing a business plan  to expand and increase circulation of The Orange County Register and Freedom's other publications throughout Southern California (the "Kushner/Spitz Business Plan").

38.    The combined fair market value of the Pension Plan's assets directly affected the financial condition of Freedom and 2100.  If the combined fair market value of the Pension Plan's assets increased, Freedom's Minimum Funding Obligations to the Pension Plan decreased.

39.    In January 2013, Kushner and Spitz each received from Freedom's pension advisory and actuarial firm, Towers Watson & Co., detailed information regarding the responsibilities of Fiduciaries of the Pension Plan.

40.    In March 2013, Aon Hewitt replaced Towers Watson & Co. as Freedom's pension advisory and actuarial firm.

41.    Effective September 11, 2013, the Investment Committee adopted an Investment Policy Statement for the Pension Plan (the "Investment Policy") setting forth guidelines for investing the assets of the Pension Plan (the "Investment Guidelines").  A copy of the Investment Policy is attached hereto as Exhibit 2.  The Investment Guidelines are found at pp. 12-13.  The Investment Guidelines set forth "an investment strategy the [Investment] Committee . . . determined is appropriate for managing the [Pension Plan's] assets," and thus constituted an instrument governing the Pension Plan.

42.    On November 21, 2013, due to Freedom's failure to generate the revenues necessary to implement and fund the Kushner/Spitz Business Plan, Kushner and Spitz each authorized and caused 2100, Freedom, and other subsidiaries of 2100 (collectively, the "Freedom Obligors"), to enter into a $26 million credit facility with Silver Point Finance, LLC ("Silver Point" and the "Silver Point Credit Agreement").

43.    Under the Silver Point Credit Agreement, the financial obligations of the Freedom Obligors, including all borrowed sums outstanding plus all fees, costs, and charges (collectively, the "Silver Point Obligation"), were secured by first-priority liens granted in favor of Silver Point on

substantially all of the real, personal, and intellectual property of the Freedom Obligors, and on the rights of the Freedom Obligors to such property (the "Silver Point Liens").

44.     In or around December 2013, Kushner and Spitz together engaged Covelli and the Covelli Entities to provide advice and other pension-related services concerning the investment of the Pension Plan's assets.

45.     On April 15, 2014, Freedom failed to satisfy its Minimum Funding Obligation owed to the Pension Plan.

46.     On July 11, 2014, Silver Point delivered to the Freedom Obligors notices of default for the Silver Point Credit Agreement, which accelerated payment of the Silver Point Obligation.

47.     On July 15 and September 15, 2014, Freedom again failed to satisfy its Minimum Funding Obligations owed to the Pension Plan.

48.     On September 16, 2014, Silver Point commenced nonjudicial foreclosures of the Silver Point Liens, and scheduled foreclosure sales on November 3, 2015, for the real properties (the "Foreclosure Sales").

49.     On October 15, 2014, and on January 15, 2015, Freedom again failed to satisfy its Minimum Funding Obligations owed to the Pension Plan.

50.     Effective March 10, 2015, Kushner resigned from 2100, Freedom, and 2100's other subsidiaries.  Spitz resigned as Freedom's president and became chairman of Freedom's board of directors.

51.     On April 15, July 15, September 15, and October 15, 2015, Freedom again failed to satisfy the Minimum Funding Obligations owed to the Pension Plan.

**Freedom, Post-commencement of the Bankruptcy Case**

52.     On November 1, 2015, and November 2, 2015 (together, the "Bankruptcy Date"), 2100, Freedom, and other subsidiaries of 2100 including all of the Freedom Obligors (collectively, the "Freedom Debtors"), filed bankruptcy thereby commencing the Bankruptcy Case and staying the Foreclosure Sales.

53.     On November 10, 2015, the United States Trustee for the Central District of California formed the Official Committee of Unsecured Creditors of Freedom Communications, Inc.

*et al.* (the "Creditors' Committee").  The Creditors' Committee consists of PBGC and certain other creditors of the Freedom Debtors.[2]

54.     As of the Bankruptcy Date, the Freedom Debtors owed Silver Point approximately $19.5 million, secured by the Silver Point Liens.  In addition, the Freedom Debtors owed the Pension Plan approximately $15.5 million (the "Pension Contribution Obligation") excluding interest, secured by statutory liens perfected by PBGC on behalf of the Pension Plan.  PBGC perfected the statutory liens, before the Bankruptcy Date, against the property and rights to property of Freedom and the members of its "controlled group" (as defined by 29 U.S.C. § 1301(a)(14)), pursuant to section 430(k) of the Internal Revenue Code (collectively, the "430(k) Liens").  *See* 26 U.S.C. § 430(k)**.**

55.     On March 30, 2016, the Freedom Debtors sold all assets free and clear of both the Silver Point Liens and the 430(k) Liens, to a Bankruptcy Court-approved bidder that did not assume any liabilities associated with the Pension Plan, and the Freedom Debtors ceased all business operations.[3]  The Freedom Debtors applied the proceeds to satisfy the Silver Point Obligation and the Pension Contribution Obligation.  PBGC's unsecured claims remain unsatisfied.  Limited proceeds remain for the Freedom Debtors to distribute to unsecured creditors.

**Termination of the Pension Plan and PBGC's Investigation**

56.     On May 5, 2016, PBGC issued to the Administrative Committee a notice of determination under 29 U.S.C. § 1342(a) that the Pension Plan would be unable to pay benefits when due, and that the Plan should be terminated under 29 U.S.C. § 1342(c).

57.     On May 18, 2016, Spitz, acting on behalf of the Administrative Committee, which was the administrator of the Pension Plan within the meaning of 29 U.S.C. § 1301(a)(1), entered into an agreement with PBGC, pursuant to 29 U.S.C. § 1342(c), that terminated the Pension Plan,

---

[2]  Notice of Appointment of Creditors' Committee Filed by United States Trustee, *In re Freedom Communications, Inc., et al.* No. 15-15315 (Bankr. C.D. Cal. Nov 10, 2015), ECF No. 77. On January 26, 2017, the Creditors' Committee sued the Defendants and certain other parties, on behalf of the Freedom Debtors, for various causes of action available under the Bankruptcy Code and the laws of the State of California.  The suit remains ongoing.  *See Complaint*, Adversary Proceeding No. 17-01012-MW, *Official Committee of Unsecured Creditors of Freedom Communications, Inc. and 2100 Freedom Inc. v. Kushner, Spitz, et al.*, (Bankr. C.D. Cal. Jan 26, 2017), ECF No. 1.

[3]  *See* Order: (A) Authorizing the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, etc., *In re Freedom Communications, Inc., et al.* No. 15-15315 (Bankr. C.D. Cal. Mar. 30, 2016), ECF No. 562.

effective March 31, 2016 (the "Termination Date"), and appointed PBGC the Pension Plan's statutory trustee (the "Trusteeship Agreement").  On May 23, 2016 (the "Trusteeship Date"), PBGC signed the Trusteeship Agreement, and it became effective.  A copy of the Trusteeship Agreement is attached hereto as Exhibit 3.

58.    PBGC estimates that as of the Termination Date the Pension Plan had "unfunded benefit liabilities"[4] of approximately $219.1 million.

59.    As the Pension Plan's trustee, PBGC is authorized to recover any liabilities owed to the Pension Plan, *see* 29 U.S.C. §§ 1342(d), 1362(c), including any liabilities owed pursuant to 29 U.S.C. §§ 1105, 1109.

60.    Following the Trusteeship Date, PBGC gathered investment and other business records relating to the Pension Plan and investigated whether any of the Fiduciary Standards had been violated and whether any Prohibited Transactions had occurred.  PBGC identified four investments that involved either Prohibited Transactions or violations of the Fiduciary Standards, or both.  PBGC estimates that these schemes caused approximately $83.1 million in damages, plus interest.  The four investments are discussed below.

**The 2100 Stock Transaction**

61.    On or about October 11, 2013, Kushner and Spitz each authorized and caused the Pension Plan to invest approximately $7.25 million to acquire 665,748 shares of Series E preferred stock and 665,748 shares of Class F non-voting stock of 2100 (the "2100 Stock Transaction" and the Series E and Class F shares collectively, the "Shares").

62.    Kushner and Spitz each sought for the 2100 Stock Transaction to benefit the Freedom Obligors and themselves as owners of 2100 through the realization of an approximately $7.25 million increase in the assets available to the Freedom Obligors to implement the Kushner/Spitz Business Plan and/or to satisfy the Silver Point Obligation.  Accordingly, rather than acting in the best interest of the Participants and Beneficiaries, Kushner and Spitz authorized and caused the 2100

---

[4] 29 U.S.C. § 1301(a)(18).  On April 1, 2016, PBGC filed against the Freedom Debtors a proof of claim for the Pension Plan's unfunded benefit liabilities with a lower estimated amount, as its investigation was not yet underway, and its estimate of the market value of the Pension Plan's assets was therefore not accurate.  *See Proof of Claim of Pension Benefit Guaranty Corporation Against Freedom Communications, Inc., et al. of $154,566,070.00*, No. 15-15315 (Bankr. C.D. Cal. Apr. 1, 2016), Claim No. 503-1.  PBGC anticipates amending its proofs of claim.

Stock Transaction to increase the assets available to the Freedom Obligors to implement the Kushner/Spitz Business Plan and to satisfy the Silver Point Obligation.

63.     Before authorizing and causing the 2100 Stock Transaction, Kushner and Spitz each knew that (a) the Freedom Obligors were or would soon become heavily indebted to Silver Point under the Silver Point Credit Agreement; (b) substantially all of the property of the Freedom Obligors would be encumbered by the Silver Point Liens; (c) 2100's liabilities exceeded the value of its assets; and (d) the Pension Plan's cost to acquire the stock was greater than the fair market value of the Shares (the "Insider Information").  Following the 2100 Stock Transaction, Kushner and Spitz each knowingly authorized and caused the Pension Plan to overstate the fair market value of the Shares in the Pension Plan's subsequent Annual Reports.

**The Participant Life Insurance Transaction**

64.     Beginning in December 2013, Covelli, Kushner, and Spitz began to devise and implement a program to take out life insurance on Participants of the Pension Plan (the "Participant Life Insurance Transaction"). Covelli proposed and facilitated the scheme, and Kushner and Spitz authorized and caused the Pension Plan to (a) expend approximately $9.4 million to procure and maintain life insurance policies issued on the lives of Participants (the "Participant Life Insurance"); and (b) pay unreasonable, above-market fees, commissions, and other compensation to Covelli, and each Covelli Entity, and later to Christian and Etaros, for their advice to Kushner and Spitz (the "Participant Life Insurance Transaction Fees").

65.     On or about December 20, 2013, Aon Hewitt, as a Fiduciary of the Pension Plan, warned Kushner and Spitz that (a) the assets of the Pension Plan must be valued in accordance with generally accepted accounting principles recognized by the Financial Accounting Standards Board (the "Accounting Standards"), which provide, in pertinent part, that "[i]f a contract has a determinable cash surrender value or conversion value, that is presumed to be its fair value," *see* Accounting Standards Codification 715-30-35-60, Financial Accounting Standards Board; (b) due to the Accounting Standards, the Participant Life Insurance was not a suitable asset for the Pension Plan to acquire, as it could only be valued according to the combined determinable cash surrender or conversion values of the underlying policies; and (c) authorizing and causing the Participant Life

Insurance Transaction would be imprudent and would likely increase Freedom's Minimum Funding Obligations to the Pension Plan (the "Aon Advice").

66.    Before the Participant Life Insurance Transaction, Covelli and the Covelli Entities each advised Kushner and Spitz to authorize and cause the Participant Life Insurance Transaction under the false presumptions that (a) the Participant Life Insurance would be valued in excess of the combined determinable cash surrender or conversion values of the underlying policies; (b) the Participant Life Insurance Transaction would substantially increase the combined fair market value of the Pension Plan's assets; and (c) the Participant Life Insurance Transaction would decrease Freedom's Minimum Funding Obligations to the Pension Plan (together, the "Participant Life Insurance Transaction Presumptions").

67.    In forming the Participant Life Insurance Transaction Presumptions, Covelli, Christian, Etaros, and the Covelli Entities each knew or should have known, yet failed to consider, the Accounting Standards and the Aon Advice.

68.    Kushner and Spitz each accepted the Participant Life Insurance Presumptions without seeking adequate assurances of their validity or adequate assurances of the professional credentials, experience, and expertise of Covelli and the Covelli Entities.

69.    Through the Participant Life Insurance Transaction, Kushner and Spitz each sought to benefit the Freedom Obligors and themselves as owners of 2100 through a decrease of Freedom's Minimum Funding Obligation to the Pension Plan.  Accordingly, rather than acting in the best interest of the Participants and Beneficiaries, Kushner and Spitz authorized and caused the Participant Life Insurance Transaction to increase the assets available to the Freedom Obligors to implement the Kushner/Spitz Business Plan and to satisfy the Silver Point Obligation.

70.    Covelli, Christian, Etaros and the Covelli Entities each sought for the Participant Life Insurance Transaction to benefit themselves as recipients of the Participant Life Insurance Transaction Fees.

71.    On or about December 30, 2013, Kushner and Spitz each authorized and caused the Participant Life Insurance Transaction.

72.    The Participant Life Insurance Transaction was not consistent with the Investment Guidelines.

73.    In May 2014, the Pension Plan's long-retained auditor and accountant, LTSP, Inc., advised Kushner and Spitz that it would no longer audit the Pension Plan, because of the Participant Life Insurance Transaction and the 2100 Stock Transaction.

74.    On or about June 14, 2014, Christian and Etaros began working with Covelli and the Covelli Entities in connection with the Participant Life Insurance Transaction.  Covelli or the Covelli Entities compensated Christian and Etaros for their services.

75.    On or about August 13, 2014, Christian and Etaros erroneously advised Kushner and Spitz that the fair market value of the Participant Life Insurance was determinable according to the present value of the expected death benefits of the underlying policies (the "Etaros Valuation Method").

76.    Kushner and Spitz each authorized and caused the Pension Plan to overstate the fair market value of the Participant Life Insurance, according to the Etaros Valuation Method, in the Pension Plan's subsequent Annual Reports.

77.    On or about October 8, 2014, in an amendment to the Aon Hewitt Master Consulting Agreement, Aon Hewitt disavowed its role as a Fiduciary of the Pension Plan, stating that, "effective December 1, 2013, [Freedom] relieved [Aon Hewitt] as the Named Fiduciary . . . with respect to [Freedom's] decision to acquire [plan] owned life insurance interests."

78.    Following the Participant Life Insurance Transaction, Spitz and Kushner were unable to obtain a legal opinion validating the Etaros Valuation Method, or a clean audit from the Pension Plan's newly retained accountant and auditor, Sensiba San Filippo LLP.  As a result, Spitz and Kushner were forced to admit that the Participant Life Insurance could only be valued according to the determinable cash surrender or conversion values of the underlying policies.

79.    In January 2016, Spitz authorized and caused the Pension Plan to liquidate the Participant Life Insurance for the cash surrender values of the underlying policies, approximately $320,000.

**The LT Funding Transaction**

80.     In 2014, Covelli devised a second program involving life insurance (the "LT Funding Transaction").  He persuaded Kushner and Spitz to authorize and cause the Pension Plan to (a) invest approximately $32 million in a limited liability company wholly owned by the Pension Plan, LT Funding, LLC ("LT Funding"),  (b) have LT Funding enter into contractual obligations to loan tens of millions of dollars to over 80 irrevocable life insurance trusts (the "LT Funding Obligations" and the "ILITs," respectively) for the purpose of funding premiums on life insurance policies owned by the ILITs (the "ILIT-owned Policies); and (c) pay unreasonable, above-market fees and other compensation to Covelli, Christian, Etaros, and each Covelli Entity (the "LT Funding Transaction Fees").

81.     Before the LT Funding Transaction, the Defendants each knew or should have known that (a) the net worth of LT Funding would likely be negative at any point in time (i.e., the present value of the LT Funding Obligations would exceed the combined present value of LT Funding's assets and future revenues, taking into account the life expectancies of the insureds), and (b) a decrease in the combined fair market value of the Pension Plan's assets was a significant risk of the LT Funding Transaction (the "Actuarial Information").

82.     Before the LT Funding Transaction, Covelli, Christian, Etaros, and the Covelli Entities each advised Kushner and Spitz to authorize and cause the LT Funding Transaction based upon their false presumptions that (a) the fair market value of LT Funding would be substantially more than the cost of LT  Funding to the Pension Plan; (b) the LT Funding Transaction would significantly increase the combined fair market value of the Pension Plan's assets; and (c) the LT Funding Transaction would decrease Freedom's Minimum Funding Obligations to the Pension Plan (together, the "LT Funding Transaction Presumptions").

83.     In forming the LT Funding Transaction Presumptions, Covelli, Christian, Etaros, and the Covelli Entities each failed to consider the Actuarial Information; medical underwriting for any of the ILIT-owned Policies; a proper applicable interest rate; or, for each ILIT-owned Policy, a proper comparison of the present value of expected death benefits to the present value of premiums owed over the corresponding insured's expected lifetime.

84. Before the LT Funding Transaction, one of the Covelli Entities, JTR, had entered into loan agreements with several of the ILITs (the "JTR Obligations"). By the time of the LT Funding Transaction, JTR could no longer afford to satisfy the JTR Obligations.

85. Before authorizing and causing the LT Funding Transaction, Spitz and Kushner each failed to seek adequate assurances of the validity of the LT Funding Transaction Presumptions, or of the professional credentials, experience, or expertise of Covelli, Christian, Etaros, or the Covelli Entities.

86. Kushner and Spitz each sought for the LT Funding Transaction to benefit the Freedom Obligors and themselves as owners of 2100 through a decrease of Freedom's Minimum Funding Obligation to the Pension Plan. Accordingly, rather than acting in the best interest of the Participants and Beneficiaries, Kushner and Spitz's authorized and caused the LT Funding Transaction to increase the assets available to the Freedom Obligors to implement the Kushner/Spitz Business Plan and to satisfy the Silver Point Obligation.

87. Covelli, Christian, Etaros and the Covelli Entities each sought for the LT Funding Transaction to benefit themselves as recipients of the LT Funding Transaction Fees.

88. On or about December 31, 2014, Kushner and Spitz each (a) authorized and caused the LT Funding Transaction; and (b) agreed with JTR, on behalf of LT Funding, LLC, to replace JTR with LT Funding, LLC, as the obligor with respect to the JTR Obligations, and, in exchange for $3.6 million (the "JTR Subordination Fee"), to subordinate the JTR Obligations to the LT Funding Obligations.

89. Covelli and JTR sought for the LT Funding Transaction to benefit themselves as the transaction would relieve JTR from the JTR Obligations and provide the JTR Subordination Fee.

90. The LT Funding Transaction was not consistent with the Investment Guidelines.

91. Following the LT Funding Transaction, Kushner and Spitz each knowingly caused the Pension Plan to overstate the fair market value of LT Funding in the Pension Plan's subsequent Annual Reports.[5]

---

[5] On November 12, 2018, LT Funding filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code. *In re LT Funding, LLC*, 18-bk-23282, U.S. Bankruptcy Court, Central District of California.

**The Topaz Transaction**

92.     On or about October 13, 2014, Kushner and Spitz each authorized and caused the Pension Plan to invest approximately $6 million to acquire an interest (the "Topaz Interest") in the Topaz MP Fixed Income Fund (the "Topaz Fund"), an unproven, high-risk foreign investment fund (the "Topaz Transaction").

93.     According to the Topaz Fund's advertising material, the Topaz Fund boasted "a new yearly distribution of 14% over 5 years offers the prospect of a 70% total net return at the end of five years."  The materials promised "100% loss protection" by an underwriter, "thus guaranteeing the investor his total return."

94.     Before authorizing and causing the Topaz Transaction, Kushner and Spitz each knew or should have known that (a) the Topaz Fund was newly established by EQUI, a Luxembourg-based investment fund manager with no reliable record of investment returns; (b) the fair market value of the Topaz Interest was likely less than the Pension Plan's acquisition cost; (c) the Topaz Interest, if acquired, presented an unreasonable risk to the Pension Plan; (d) the fees and commissions associated with the transaction were excessive and not typical or appropriate for such an asset class; and (e) the Topaz Transaction could likely result in a significant decrease in the combined fair market value of the Pension Plan's assets (the "Topaz Information").

95.     On or about October 3, 2014, Aon Hewitt informed Kushner and Spitz that, "[t]he Topaz fund would not be our preferred choice of asset manager to access this asset class . . ."   Aon Hewitt stated that it had "concerns about the lack of track record of the investment thesis and . . . the relatively large upfront fee and placement commission."   Specifically, Aon Hewitt informed Kushner and Spitz that such fees were "not typical" and would "cause an immediate small loss to the [Pension Plan]."

96.     On or about October 8, 2014, in an amendment to the Aon Hewitt Master Consulting Agreement, Aon Hewitt disavowed its role as a Fiduciary of the Pension Plan, stating that, "effective October 1, 2014, [Freedom] relieved [Aon Hewitt] as the Named Fiduciary . . . with respect to [Freedom's] decision to acquire interests in the Topaz Fixed Income Fund."

97.     Following the Topaz Transaction, the government of Luxembourg withdrew EQUI from its list of licensed investment fund managers (due to apparent non-compliance issues) and

stated that EQUI and the underwriters of Topaz would soon become the subject of subsequent liquidation proceedings.

98.    On October 31, 2016, the Topaz Fund stopped trading.  On February 2, 2017, the Italian Ministry of Economic Development announced that the underwriter of EQUI would be administratively liquidated.  Those liquidation proceedings remain ongoing and, thus, on information and belief, the Topaz Interest has no discernable fair market value and is worthless.

99.    Kushner and Spitz each sought for the Topaz Transaction to benefit the Freedom Obligors and themselves as owners of 2100 through a decrease of Freedom's Minimum Funding Obligation to the Pension Plan.   Accordingly, rather than acting in the best interest of the Participants and Beneficiaries, Kushner and Spitz authorized and caused the Topaz Transaction to increase the assets available to the Freedom Obligors to implement the Kushner/Spitz Business Plan and to satisfy the Silver Point Obligation.

100.    Following the Topaz Transaction, Kushner and Spitz each authorized and caused the Pension Plan to overstate the fair market value of the Topaz Interest in the Pension Plan's subsequent Annual Reports.

### Count I
### Against Kushner and Spitz for Breach of Duty of Loyalty
### (2100 Stock Transaction)

101.    PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

102.    At all times relevant to this Count, Kushner and Spitz each were Fiduciaries of the Pension Plan, and each Fiduciary was a co-Fiduciary of the other pursuant to 29 U.S.C. § 1105.

103.    Kushner and Spitz were each acting as a Fiduciary of the Pension Plan when they authorized and caused the Pension Plan to invest in the 2100 Stock Transaction.

104.    Because Kushner and Spitz each sought for the 2100 Stock Transaction to benefit the Freedom Obligors and themselves as owners of 2100, their authorization and causation of the 2100 Stock Transaction was not solely in the interest of the Participants and Beneficiaries.

105.   Because Kushner and Spitz's authorization and causation of the 2100 Stock Transaction was not solely in the interest of the Participants and Beneficiaries, Kushner and Spitz each violated their Duty of Loyalty to the Pension Plan under 29 U.S.C. § 1104(a)(1)(A).

106.   Because Kushner and Spitz authorized and caused the 2100 Stock Transaction to increase the assets available to the Freedom Obligors to implement the Kushner/Spitz Business Plan and to satisfy the Silver Point Obligation, Kushner and Spitz's authorization and causation of the 2100 Stock Transaction was not for the exclusive purpose of providing benefits to the Participants and Beneficiaries.

107.   Because Kushner and Spitz's authorization and causation of the 2100 Stock Transaction was not for the exclusive purpose of providing benefits to Participants and Beneficiaries, Kushner and Spitz each violated their Duty of Loyalty to the Pension Plan under 29 U.S.C. § 1104(a)(1)(A).

108.   As a direct and proximate result of Kushner and Spitz's violations of their Duty of Loyalty in connection with the 2100 Stock Transaction, the Pension Plan suffered losses of at least $7.25 million, plus interest and lost opportunity costs.  In addition to the cost of the Shares, the losses include, but are not limited to, the increase in the Minimum Funding Obligations that would have been due if the Annual Reports did not overstate the fair market value of the Shares.

109.   For their violations of the Duty of Loyalty in connection with the 2100 Stock Transaction, PBGC requests that Kushner and Spitz each be held personally liable under 29 U.S.C. § 1109(a) to make good all losses suffered by the Pension Plan and to restore to the Pension Plan any lost profit associated therewith.

**Count II**
**Against Kushner and Spitz for Breach of Duty of Prudence**
**(2100 Stock Transaction)**

110.   PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

111.   At all times relevant to this Count, Kushner and Spitz each were Fiduciaries of the Pension Plan, and each Fiduciary was a co-Fiduciary of the other pursuant to 29 U.S.C. § 1105.

112.    Kushner and Spitz were each acting as a Fiduciary of the Pension Plan when they authorized and caused the Pension Plan to invest in the 2100 Stock Transaction.

113.    Because Kushner and Spitz each knew yet failed to adequately consider the Insider Information, Kushner and Spitz each failed to act with Due Diligence before authorizing and causing the 2100 Stock Transaction.

114.    Because Kushner and Spitz each failed to act with Due Diligence, Kushner and Spitz each violated their Duty of Prudence with respect to the Pension Plan under 29 U.S.C. § 1104(a)(1)(B).

115.    As a direct and proximate result of Kushner and Spitz's violations of their Duty of Prudence in connection with the 2100 Stock Transaction, the Pension Plan suffered losses of at least $7.25 million, plus interest and lost opportunity costs.  In addition to the cost of the Shares, the losses include, but are not limited to, the increase in the Minimum Funding Obligations that would have been due if the Annual Reports did not overstate the fair market value of the Shares.

116.    For their violations of the Duty of Prudence in connection with the 2100 Stock Transaction, PBGC requests that Kushner and Spitz each be held personally liable under 29 U.S.C. § 1109(a) to make good all losses suffered by the Pension Plan and to restore to the Pension Plan any lost profits associated therewith.

**Count III**
**Against Kushner and Spitz for Breach of Duty of Loyalty**
**(Participant Life Insurance Transaction)**

117.    PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

118.    At all times relevant to this Count, Kushner and Spitz each were Fiduciaries of the Pension Plan, and each Fiduciary was a co-Fiduciary of the other pursuant to 29 U.S.C. § 1105.

119.    Kushner and Spitz were each acting as a Fiduciary of the Pension Plan at the time they authorized and caused the Pension Plan to invest in the Participant Life Insurance Transaction.

120.    Because Kushner and Spitz each sought for the Participant Life Insurance Transaction to benefit the Freedom Obligors and themselves as owners of 2100, their authorization and causation of the Participant Life Insurance Transaction was not solely in the interest of the Participants and Beneficiaries.

121.   Because the Participant Life Insurance Transaction was for the purposes of (a) increasing the assets available to the Freedom Obligors to implement the Kushner/Spitz Business Plan and to satisfy the Silver Point Obligation, and (b) funding the Participant Life Insurance Transaction Fees, it was not for the exclusive purpose of providing benefits to Participants and Beneficiaries.

122.   Because Kushner and Spitz's authorization and causation of the Participant Life Insurance Transaction was not solely in the interest of the Participants and Beneficiaries, Kushner and Spitz each violated their Duty of Loyalty to the Pension Plan under 29 U.S.C. § 1104(a)(1)(A).

123.   As a direct and proximate result of Kushner's and Spitz's violations of their Duty of Loyalty in connection with the Participant Life Insurance Transaction, the Pension Plan suffered losses of approximately $9.4 million, plus interest and lost opportunity costs. In addition to the cost of the Participant Life Insurance, the losses include, but are not limited to, the increase in the Minimum Funding Obligations that would have been due if the Annual Reports did not overstate in the Annual Reports the fair market value of the Participant Life Insurance.

124.   For their violations of the Duty of Loyalty in connection with the Participant Life Insurance Transaction, PBGC requests that Kushner and Spitz each be held personally liable under 29 U.S.C. § 1109(a) to make good all losses suffered by the Pension Plan and to restore to the Pension Plan any lost profit associated therewith.

**Count IV**
**Against Kushner and Spitz for Breach of Duty of Prudence**
**(Participant Life Insurance Transaction)**

125.   PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

126.   At all times relevant to this Count, Kushner and Spitz each were Fiduciaries of the Pension Plan, and each Fiduciary was a co-Fiduciary of the other pursuant to 29 U.S.C. § 1105.

127.   Kushner and Spitz were each acting as a Fiduciary of the Pension Plan at the time they authorized and caused the Pension Plan to invest in the Participant Life Insurance Transaction.

128.   Because Kushner and Spitz each accepted the Participant Life Insurance Presumptions without seeking sufficient assurances of their validity or adequately verifying the

professional credentials, experience, or expertise of Covelli, Christian, Etaros, or the Covelli Entities, and by failing to adequately consider the Accounting Standards and the Aon Advice, Kushner and Spitz each failed to act with Due Diligence before authorizing and causing the Participant Life Insurance Transaction.

129.    Because Kushner and Spitz each failed to act with Due Diligence, Kushner and Spitz each violated their Duty of Prudence with respect to the Pension Plan under 29 U.S.C. § 1104(a)(1)(B).

130.    As a direct and proximate result of Kushner's and Spitz's violations of their Duty of Prudence in connection with the Participant Life Insurance Transaction, the Pension Plan suffered losses of approximately $9.4 million, plus interest and lost opportunity costs.  In addition to the cost of the Participant Life Insurance, the damages include, but are not limited to, the increase in the Minimum Funding Obligations that would have been due if the Annual Reports did not overstate the fair market value of the Participant Life Insurance.

131.    For their violations of the Duty of Prudence in connection with the Participant Life Insurance Transaction, PBGC requests that Kushner and Spitz each be held personally liable under 29 U.S.C. § 1109(a) to make good all losses suffered by the Pension Plan and to restore to the Pension Plan any lost profits associated therewith.

**Count V**
**Against Kushner and Spitz for Breach of Duty to Act in Accordance with Plan Documents**
**(Participant Life Insurance Transaction)**

132.    PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

133.    At all times relevant to this Count, Kushner and Spitz each were Fiduciaries of the Pension Plan, and each Fiduciary was a co-Fiduciary of the other pursuant to 29 U.S.C. § 1105.

134.    Kushner and Spitz were each acting as a Fiduciary of the Pension Plan at the time they authorized and caused the Pension Plan to invest in the Participant Life Insurance Transaction.

135.    By authorizing and causing the Participant Life Insurance Transaction in contravention of the Investment Guidelines, Kushner and Spitz each violated their Duty to Act in Accordance with Plan Documents under 29 U.S.C. § 1104(a)(1)(D).

136.   As a direct and proximate result of Kushner's and Spitz's violations of their Duty to Act in Accordance with Plan Documents in connection with the Participant Life Insurance Transaction, the Pension Plan suffered losses of approximately $9.4 million, plus interest and lost opportunity costs.  In addition to the cost of the Participant Life Insurance, the losses include, but are not limited to, the increase in the Minimum Funding Obligations that would have been due if the Annual Reports did not overstate the fair market value of the Participant Life Insurance.

137.   For their violations of the Duty to Act in Accordance with Plan Documents in connection with the Participant Life Insurance Transaction, PBGC requests that Spitz and Kushner each be held personally liable under 29 U.S.C. § 1109(a) to make good all losses suffered by the Pension Plan and to restore to the Pension Plan any lost profits associated therewith.

### Count VI
**Against Kushner and Spitz for Breach of Duty of Loyalty**
**(LT Funding Transaction)**

138.   PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

139.   At all times relevant to this Count, Kushner and Spitz each were Fiduciaries of the Pension Plan, and each Fiduciary was a co-Fiduciary of the other pursuant to 29 U.S.C. § 1105.

140.   Kushner and Spitz were each acting as a Fiduciary of the Pension Plan at the time they authorized and caused the Pension Plan to invest in the LT Funding Transaction.

141.   Because Kushner and Spitz each sought for the LT Funding Transaction to benefit the Freedom Obligors and themselves as owners of 2100, their authorization and causation of the LT Funding Transaction was not solely in the interest of the Participants and Beneficiaries.

142.   Because the LT Funding Transaction was for the purpose of (a) reducing the Minimum Funding Obligations, and thereby increasing the assets available to the Freedom Obligors to implement the Kushner/Spitz Business Plan and to satisfy the Silver Point Obligation, and (b) funding the LT Funding Transaction Fees, it was not for the exclusive purpose of providing benefits to Participants and Beneficiaries.

143.   Because the LT Funding Transaction was not for the exclusive purpose of providing benefits to Participants and Beneficiaries, Kushner and Spitz each violated their Duty of Loyalty to

the Pension Plan under 29 U.S.C. § 1104(a)(1)(A) when they authorized and caused the LT Funding Transaction.

144.    As a direct and proximate result of Kushner's and Spitz's violations of their Duty of Loyalty in connection with the LT Funding Transaction, the Pension Plan suffered losses of at least $32 million, plus interest and lost opportunity costs.  In addition to the cost of the LT Funding Transaction, the losses include, but are not limited to, the increase in the Minimum Funding Obligations that would have been due if the Annual Reports did not overstate the fair market value of LT Funding.

145.    For their violations of the Duty of Loyalty in connection with the LT Funding Transaction, PBGC requests that Kushner and Spitz each be held personally liable under 29 U.S.C. § 1109(a) to make good all losses suffered by the Pension Plan and to restore to the Pension Plan any lost profit associated therewith.

### Count VII
### Against Kushner and Spitz for Breach of Duty of Prudence
### (LT Funding Transaction)

146.    PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

147.    At all times relevant to this Count, Kushner and Spitz each were Fiduciaries of the Pension Plan, and each Fiduciary was a co-Fiduciary of the other pursuant to 29 U.S.C. § 1105.

148.    Kushner and Spitz were each acting as a Fiduciary of the Pension Plan at the time they authorized and caused the Pension Plan to invest in the LT Funding Transaction.

149.    Because Kushner and Spitz each  (a) accepted the LT Funding Transaction Presumptions without seeking sufficient assurances of their validity, (b) failed to adequately verify the professional credentials, experience, or expertise of Covelli, Christian, Etaros, or the Covelli Entities, and (c) failed to consider the Actuarial Information; medical underwriting for any of the ILIT-owned Policies; a proper applicable interest rate; or, for each ILIT-owned Policy, a proper comparison of the present value of expected death benefits to the present value of premiums owed over the corresponding insured's expected lifetime, Kushner and Spitz each failed to act with Due Diligence before authorizing and causing the LT Funding Transaction.

150.    Because Kushner and Spitz each failed to act with Due Diligence, Kushner and Spitz each violated their Duty of Prudence with respect to the Pension Plan under 29 U.S.C. § 1104(a)(1)(B).

151.    As a direct and proximate result of the Defendants' violations of their Duty of Prudence in connection with the LT Funding Transaction, the Pension Plan suffered losses of at least $32 million, plus interest and lost opportunity costs.  In addition to the cost of the LT Funding Transaction, the losses include, but are not limited to, the increase in the Minimum Funding Obligations that would have been due if the Annual Reports did not overstate the fair market value of LT Funding.

152.    For their violations of the Duty of Prudence in connection with the LT Funding Transaction, PBGC requests that Kushner and Spitz each be held personally liable under 29 U.S.C. § 1109(a) to make good all losses suffered by the Pension Plan and to restore to the Pension Plan any lost profits associated therewith.

**Count VIII**
**Against Kushner and Spitz for Breach of Duty to Act in Accordance with Plan Documents**
**(LT Funding Transaction)**

153.    PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

154.    At all times relevant to this Count, Kushner and Spitz each were Fiduciaries of the Pension Plan, and each Fiduciary was a co-Fiduciary of the other pursuant to 29 U.S.C. § 1105.

155.    Kushner and Spitz were each acting as a Fiduciary of the Pension Plan at the time they authorized and caused the Pension Plan to invest in the LT Funding Transaction.

156.    By authorizing and causing the LT Funding Transaction in contravention of the Investment Guidelines, Kushner and Spitz each violated their Duty to Act in Accordance with Plan Documents under 29 U.S.C. § 1104(a)(1)(D).

157.    As a direct and proximate result of Kushner's and Spitz's violations of their Duty to Act in Accordance with Plan Documents in connection with the LT Funding Transaction, the Pension Plan suffered losses of at least $32 million, plus interest and lost opportunity costs.  In addition to the cost of the LT Funding Transaction, the losses include, but are not limited to, the

increase in the Minimum Funding Obligations that would have been due if the Annual Reports did not overstate the fair market value of LT Funding.

158.    For their violations of the Duty to Act in Accordance with Plan Documents in connection with the LT Funding Transaction, PBGC requests that Kushner and Spitz each be held personally liable under 29 U.S.C. § 1109(a) to make good all losses suffered by the Pension Plan and to restore to the Pension Plan any lost profits associated therewith.

**Count IX**
**Against Covelli for Knowing Participation in a Breach**
**of Fiduciary Duties in Violation of ERISA**
**(Participant Life Insurance Transaction)**

159.    PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

160.    In 2013, Covelli contacted Kushner and Spitz and proposed the Participant Life Insurance Transaction to purportedly reduce or eliminate the Pension Plan's underfunding.  Covelli retained and compensated Christian, an unqualified actuary, to artificially inflate the value of the Participant Life Insurance policies to substantially more than their cost.  The commission that Covelli and his business associate charged the Pension Plan for the Participant Life Insurance Transaction was based on the difference in value between what the Pension Plan paid and the actuary's valuation.  Therefore, Covelli had a conflict of interest.  Covelli proceeded with the scheme even after the Pension Plan's advisor, Aon Hewitt, opined that the proposed valuation method violated the applicable accounting standards and recommended not making the investment.

161.    Covelli participated in a campaign to convince Plan Participants to enroll in the Participant Life Insurance Program.  He drafted letters to Participants, scheduled meetings with Participants, and provided Kushner and Spitz with information to give to Participants.

162.    Kushner and Spitz were each acting as a Fiduciary of the Pension Plan at the time they authorized and caused the Pension Plan to make an initial investment of $9.4 million in the Participant Life Insurance Transaction.

163.    Consistent with Aon Hewitt's advice, the Pension Plan's auditors, Sensiba San Filippo LLP concluded that the Participant Life Insurance policies must be valued at their cash surrender value in order for the Pension Plan to receive a clean audit opinion.  Kushner and Spitz

abandoned the Participant Life Insurance program, and stopped making premium payments. By authorizing and causing the Participant Life Insurance Transaction, Kushner and Spitz each violated their fiduciary duties of Loyalty and Prudence under 29 U.S.C. § 1104(a)(1)(A) and (B). *See* Counts III and IV above.

164.    As a direct and proximate result of the Kushner's and Spitz's violations of their duties of Loyalty and Prudence in connection with the Participant Life Insurance Transaction, the Pension Plan suffered losses of approximately $9.4 million, plus interest and lost opportunity costs.

165.    At all times relevant herein, Covelli knew that Kushner and Spitz were acting on behalf of the Pension Plan and using Pension Plan money to invest in the Participant Life Insurance Transaction.

166.    At all times relevant herein, Covelli knew that Kushner and Spitz were putting their own interests and the interests of Freedom above the interests of the Participants and Beneficiaries in violation of their fiduciary duty of Loyalty. In fact, Covelli designed the Participant Life Insurance Transaction to inflate the value of the Pension Plan's assets in order to reduce the Minimum Funding Obligations, thereby benefitting Kushner, Spitz, and Freedom at the expense of the Participants and Beneficiaries.

167.    At all times relevant herein, Covelli knew that Kushner and Spitz were not acting with the care, skill, prudence, and diligence under the circumstances that a prudent man would use in connection with the Participant Life Insurance Transaction, in violation of their duty of Prudence. Covelli knew that Kushner and Spitz were relying on Covelli and the actuary retained and compensated by Covelli, rather than relying on independent advice regarding the Participant Life Insurance Transaction.

168.    Covelli knowingly participated in the violations by Kushner and Spitz of the duties of Loyalty and Prudence by his comprehensive and instrumental role in designing and facilitating the Participant Life Insurance Transaction, thereby enabling Kushner and Spitz to breach their fiduciary duties.

169.    Title 29 U.S.C. § 1132(a)(3) imposes liability on non-fiduciaries who knowingly participate in fiduciary breaches in violation of ERISA.

170.     For his knowing participation in the breach of the fiduciary duties of Loyalty and Prudence in connection with the Participant Life Insurance Transaction, PBGC requests that Covelli be held liable under 29 U.S.C. § 1132(a)(3) for disgorgement of all commissions, fees and other financial benefits that he and the Covelli Entities earned, received, or obtained as a result of the Participant Life Insurance Transaction, disgorgement of any profits earned on such commissions, fees and other financial benefits, and all other appropriate equitable relief.

**Count X**
**Against Covelli for Knowing Participation in Breach of**
**Fiduciary Duties in Violation of ERISA**
**(LT Funding Transaction)**

174.     PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

175.     In 2014, Covelli developed a second scheme involving life insurance, the LT Funding Transaction, and he proposed it to Kushner and Spitz as a means of reducing or eliminating the Pension Plan's underfunding.

176.     Covelli retained and compensated an unqualified actuary to artificially inflate the value of the life settlement contracts used for the LT Funding Transaction to an amount substantially greater than their cost.  The commission that Covelli charged the Pension Plan for the LT Funding Transaction was based on the difference in value between the cost to the Pension Plan and the actuary's valuation.  Therefore, Covelli had a conflict of interest.

177.     Following Covelli's advice and relying on the inflated valuation, Kushner and Spitz authorized and caused an entity wholly owned by the Pension Plan, LT Funding, to enter into eighty-three loan agreements with irrevocable life insurance trusts (defined above as an "ILIT") to finance premium payments on life insurance policies owned by the ILITs. The loan agreements and related documents provided that LT Funding would receive a percentage of the future death benefits in exchange for making the loans.

178.     JTR, one of the Covelli Entities, had previously entered into agreements with many of the ILITs to finance the life insurance premiums.  Covelli and JTR could not afford to continue making the loans, and Covelli needed the Pension Plan to take over the loan obligations so that the policies would not lapse.  Covelli enabled the LT Funding Transaction by, among other things,

causing JTR to enter into agreements to subordinate JTR's loan security interests to LT Funding's loan security interests.

179.   Covelli and JTR charged excessive commissions and fees for the LT Funding Transaction, and they charged excessive fees for subordinating JTR's loan security interests to LT Funding's loan security interests.

180.   At all times relevant to this Count, Kushner and Spitz each were Fiduciaries of the Pension Plan, and each Fiduciary was a co-Fiduciary of the other pursuant to 29 U.S.C. § 1105.

181.   Kushner and Spitz were each acting as a Fiduciary of the Pension Plan at the time they authorized and caused the Pension Plan, through LT Funding, to invest in the LT Funding Transaction.

182.   By authorizing and causing the LT Funding Transaction, Kushner and Spitz each violated their Duties of Loyalty and Prudence under 29 U.S.C. § 1104(a)(1)(A) and (B).  *See* Counts VI and VII above.

183.   As a direct and proximate result of the Kushner's and Spitz's violations of their Duties of Loyalty and Prudence in connection with the LT Funding Transaction, the Pension Plan suffered losses of at least $32 million, plus interest and lost opportunity costs.

184.   At all times relevant herein, Covelli knew that Kushner and Spitz were acting on behalf of the Pension Plan and using the Pension Plan money to invest in the LT Funding Transaction.

185.   At all times relevant herein, Covelli knew that Kushner and Spitz were putting their own interests and the interests of Freedom above the interests of the Participants and Beneficiaries in connection with the LT Funding Transaction, in violation of their Duty of Loyalty.  Covelli designed and promoted the LT Funding Transaction as a method of artificially reducing the Pension Plan's underfunding the thereby reducing required contributions, to the benefit of Spitz, Kushner, and Freedom, and at the expense of the Participants and Beneficiaries.

186.   At all times relevant herein, Covelli knew that Kushner and Spitz were not acting with the care, skill, prudence, and diligence under the circumstances that a prudent man would use in connection with the LT Funding Transaction, in violation of their Duty of Prudence.  Among other things, Covelli knew that Kushner and Spitz did not have the medical records needed to accurately

value the life insurance policies. Covelli also knew that Kushner and Spitz failed to verify the accuracy of the valuation method used by the actuary that Covelli retained.

187. Covelli knowingly participated in the violations by Kushner and Spitz of the Duties of Loyalty and Prudence by his comprehensive and instrumental role in designing, promoting, valuing, and otherwise facilitating the LT Funding Transaction, thereby enabling Kushner and Spitz to breach their fiduciary duties.

188. Title 29 U.S.C. § 1132(a)(3) imposes liability on non-fiduciaries who knowingly participate in fiduciary breaches in violation of ERISA.

189. For his knowing participation in the breach of the fiduciary duties of Loyalty and Prudence in connection with the LT Funding Transaction, PBGC requests that Covelli be held liable under 29 U.S.C. § 1132(a)(3) for disgorgement of all commissions, the JTR Subordination Fee, other fees, and all other financial benefits that he or the Covelli entities earned, received, or obtained as a result of the LT Funding Transaction, disgorgement of any profits earned on such commissions, fees and other financial benefits, and all other appropriate equitable relief.

**Count XI**
**Against Kushner and Spitz for Breach of Duty of Loyalty**
**(Topaz Transaction)**

190. PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

191. At all times relevant to this Count, Kushner and Spitz each were Fiduciaries of the Pension Plan, and each Fiduciary was a co-Fiduciary of the other

pursuant to 29 U.S.C. § 1105.

192. Kushner and Spitz were each acting as a Fiduciary when they authorized and caused the Pension Plan to invest in the Topaz Transaction.

193. Because Kushner and Spitz each sought for the Topaz Transaction to benefit the Freedom Obligors and themselves as owners of 2100, their authorization and causation of the Topaz Transaction was not solely in the interest of the Participants and Beneficiaries.

194.   Because Kushner and Spitz's authorization and causation of the Topaz Transaction was not solely in the interest of the Participants and Beneficiaries, Kushner and Spitz each violated their Duty of Loyalty to the Pension Plan under 29 U.S.C. § 1104(a)(1)(A).

195.   Because Kushner and Spitz authorized and caused the Topaz Transaction to increase the assets available to the Freedom Obligors to implement the Kushner/Spitz Business Plan and to satisfy the Silver Point Obligation, Kushner and Spitz's authorization and causation of the Topaz Transaction was not for the exclusive purpose of providing benefits to the Participants and Beneficiaries.

196.   Because Kushner and Spitz authorized and caused the Topaz Transaction for reasons other than for the exclusive purpose of providing benefits to Participants and Beneficiaries, Kushner and Spitz each violated their Duty of Loyalty to the Pension Plan under 29 U.S.C. § 1104(a)(1)(A).

197.   As a direct and proximate result of Kushner and Spitz's violations of their Duty of Loyalty in connection with the Topaz Transaction, the Pension Plan suffered losses of at least $6 million, plus interest and lost opportunity costs.  In addition to the cost of the Topaz Transaction, the losses include, but are not limited to, the increase in the Minimum Funding Obligations that would have been due if the Annual Reports did not overstate the fair market value of the Topaz Interest.

198.   For their violations of the Duty of Loyalty in connection with the Topaz Transaction, PBGC requests that Kushner and Spitz each be held personally liable under 29 U.S.C. § 1109(a) to make good all losses suffered by the Pension Plan and to restore to the Pension Plan any lost profit associated therewith.

**Count XII**
**Against Kushner and Spitz for Breach of Duty of Prudence**
**(Topaz Transaction)**

199.   PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

200.   At all times relevant to this Count, Kushner and Spitz each were Fiduciaries of the Pension Plan, and each Fiduciary was a co-Fiduciary of the other pursuant to 29 U.S.C. § 1105.

201.   Kushner and Spitz were each acting as a Fiduciary when they authorized and caused the Pension Plan to invest in the Topaz Transaction.

202. Because Kushner and Spitz each knew yet failed to adequately consider the Topaz Information before authorizing and causing the Topaz Transaction, Kushner and Spitz each failed to act with Due Diligence.

203. Because Kushner and Spitz each failed to act with Due Diligence, Kushner and Spitz each violated their Duty of Prudence with respect to the Pension Plan under 29 U.S.C. § 1104(a)(1)(B).

204. As a direct and proximate result of Kushner and Spitz's violations of their Duty of Prudence in connection with the Topaz Transaction, the Pension Plan suffered losses of at least $6 million, plus interest and lost opportunity costs. In addition to the cost of the Topaz Transaction, the losses include, but are not limited to, the increase in the Minimum Funding Obligations that would have been if the Annual Reports did not overstate the fair market value of the Topaz Interest.

205. For their violations of the Duty of Prudence in connection with the Topaz Transaction, PBGC requests that Kushner and Spitz each be held personally liable under 29 U.S.C. § 1109(a) to make good all losses suffered by the Pension Plan and to restore to the Pension Plan any lost profits associated therewith.

### Count XIII
### Against Kushner and Spitz for Liability of Fiduciaries for Prohibited Transactions
### (Participant Life Insurance Transaction)

206. PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

207. 29 U.S.C. § 1106(a)(1)(C) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest . . . ."

208. At all times relevant to this Count, Kushner and Spitz each were Fiduciaries of the Pension Plan, and each Fiduciary was a co-Fiduciary of the other pursuant to 29 U.S.C. § 1105.

209. At all times relevant to this Count, Covelli, Christian, Etaros, and the Covelli Entities each provided services to the Pension Plan, including but not limited to investment advice and

valuation services regarding the Participant Life Insurance Transaction.  Thus, they were all Parties in Interest with respect to the Pension Plan pursuant to 29 U.S. C. § 1102(14).

210.   Because Kushner and Spitz each authorized and caused the Pension Plan to pay the Participant Life Insurance Transaction Fees to Covelli, Christian, Etaros, and/or the Covelli Entities, Kushner and Spitz each violated 29 U.S.C. § 1106(a)(1)(C).

211.   The only relevant exception to the prohibition provided in 29 U.S.C. § 1106(a)(1)(C) is under 29 U.S.C. § 1108(b)(2), which provides, in pertinent part, that the prohibitions of § 1106 do not apply to the "[c]ontracting or making reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."

212.   The Participant Life Insurance Transaction Fees paid to Covelli, Christian, Etaros, and/or the Covelli Entities were excessive and unreasonable in relation to the value of the services provided to the Plan, and thus the exception under 29 U.S.C. § 1108(b)(2) does not apply.

213.   For causing the Pension Plan to engage in Prohibited Transactions in violation of 29 U.S.C. § 1106, PBGC requests that Kushner and Spitz each be held personally liable under 29 U.S.C. § 1109(a) to make good all losses suffered by the Pension Plan and to restore to the Pension Plan any lost profits associated therewith.

**Count XIV**
**Against Kushner and Spitz for Liability of Fiduciaries for Prohibited Transactions**
**(LT Funding Transaction)**

214.   PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

215.   29 U.S.C. § 1106(a)(1)(C) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest . . . ."

216.   At all times relevant to this Count, Kushner and Spitz each were Fiduciaries of the Pension Plan, and each Fiduciary was a co-Fiduciary of the other pursuant to 29 U.S.C. § 1105.

217.    At all times relevant to this Count, Covelli, Christian, Etaros, and the Covelli Entities each provided services to the Pension Plan including, but not limited to, investment advice and valuation services in connection with the LT Funding Transaction.  Thus, they were all Parties in Interest with respect to the Pension Plan pursuant to 29 U.S.C. § 1102(14).

218.    Because Kushner and Spitz each caused the Pension Plan to pay the LT Funding Transaction Fees to Covelli, Christian, Etaros, and/or the Covelli Entities, Kushner and Spitz each violated 29 U.S.C. § 1106(a)(1)(C).

219.    The only arguably relevant exception to the prohibition provided in 29 U.S.C. § 1106(a)(1)(C) is under 29 U.S.C. § 1108(b)(2), which provides, in pertinent part, that the prohibitions of § 1106 do not apply to the "[c]ontracting or making reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."

220.    The LT Funding Transaction Fees paid to Covelli, Christian, Etaros, and/or the Covelli Entities were excessive and unreasonable in relation to the value of the services provided to the Plan, and thus the exception under 29 U.S.C. § 1108(b)(2) does not apply.

221.    For causing the Pension Plan to engage in Prohibited Transactions in violation of 29 U.S.C. § 1106, PBGC requests that Kushner and Spitz each be held personally liable under 29 U.S.C. § 1109(a) to make good all losses suffered by the Pension Plan and to restore to the Pension Plan any lost profits associated therewith

**Count XV**

**Against Kushner and Spitz for Liability of Co-fiduciaries**

222.    PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

223.    In addition to the liabilities described in the other Counts hereinabove, Kushner and Spitz are personally liable under 29 U.S.C. § 1105 to the extent they either (a) knowingly participated in or concealed the breaches of Fiduciary Standards by other Fiduciaries of the Pension Plan; (b) knowingly enabled the breaches of Fiduciary Standards by other such Fiduciaries by failing to monitor other such Fiduciaries; or (c) having knowledge of the breaches of Fiduciary Standards by such other Fiduciaries, failed to make reasonable efforts to remedy them.

224.   Kushner and Spitz acted in concert and cooperated with one another in authorizing and causing the Pension Plan to make the investments in the Participant Life Insurance, LT Funding, Topaz Fund, and the Shares.  Consequently, Kushner and Spitz each knowingly participated in and enabled the breaches of the Fiduciary Standards.  In addition, having knowledge of the fiduciary breaches, they each failed to make reasonable efforts to remedy them.  PBGC requests that Kushner and Spitz each be held personally liable under 29 U.S.C. § 1105 to make good all losses suffered by the Pension Plan and to restore to the Pension Plan any lost profits caused by the investments in the Participant Life Insurance, LT Funding, Topaz Fund, and the Shares.

### Count XVI
### Against Covelli, JTR, C & C, C2, Christian, and Etaros for
### Liability of Nonfiduciaries for Prohibited Transactions
### (Participant Life Insurance Transaction)

225.   PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

226.   At all times relevant to this Count, Covelli, Christian, Etaros, and the Covelli Entities each provided services to the Pension Plan and were thus Parties in Interest with respect to the Pension Plan pursuant to 29 U.S.C. § 1102(14).

227.   Because Covelli, Christian, Etaros, and the Covelli Entities each solicited and accepted the Participant Life Insurance Transaction Fees, Covelli, Christian, Etaros, and the Covelli Entities each engaged in one or more Prohibited Transactions in violation of 29 U.S.C. § 1106(a).

228.   The only relevant exception to the prohibition provided in 29 U.S.C. § 1106(a) is under 29 U.S.C. § 1108(b)(2), which provides, in pertinent part, that the prohibitions of § 1106 do not apply to the "[c]ontracting or making reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."

229.   The Participant Life Insurance Transaction Fees paid to Covelli, Christian, Etaros, and the Covelli Entities were excessive and unreasonable in relation to the value of the services provided to the Plan, and thus the exception under 29 U.S.C. § 1108(b)(2) does not apply.

230.    As a direct and proximate result of their engaging in Prohibited Transactions in violation of ERISA, Covelli, Christian, Etaros, and the Covelli Entities, each caused the Pension Plan to suffer losses of approximately $9.4 million in connection with the Participant Life Insurance Transaction.

231.    For their engagement in Prohibited Transactions, PBGC requests that Covelli, Christian, Etaros, and the Covelli Entities, each be required to disgorge all commissions, fees, and other financial benefits that they earned, received, or obtained as a result of engaging in the Prohibited Transactions.

### Count XVII
**Against Covelli, JTR, C & C, C2, Christian, and Etaros for Liability of Nonfiduciaries for Prohibited Transactions**
**(LT Funding Transaction)**

232.    PBGC repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

233.    At all times relevant to this Count, Covelli, Christian, Etaros, the Covelli Entities, and JTR each provided services to the Pension Plan and thus were Parties in Interest with respect to the Pension Plan pursuant to 29 U.S. C. § 1102(14).

234.    Because Covelli, Christian, Etaros, and the Covelli Entities each solicited and accepted the LT Funding Transaction Fees, Covelli, Christian, Etaros, and the Covelli Entities each engaged in one or more Prohibited Transactions in violation of 29 U.S.C. § 1106(a).

235.    The only arguably relevant exception to the prohibition provided in 29 U.S.C. § 1106(a) is under 29 U.S.C. § 1108(b)(2), which provides, in pertinent part, that the prohibitions of § 1106 do not apply to the "[c]ontracting or making reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."

236.    The LT Funding Transaction Fees paid to Covelli, Christian, Etaros, and the Covelli Entities were excessive and unreasonable in relation to the value of the services provided to the Plan, and thus the exception under 29 U.S.C. § 1108(b)(2) does not apply.

237.   Because Covelli, acting through his Covelli Entity JTR, solicited and accepted the JTR Subordination Fee, Covelli and JTR engaged in one or more Prohibited Transactions in violation of 29 U.S.C. § 1106(a).

238.   The JTR Subordination Fee was excessive and unreasonable in relation to the value of the services provided to the Pension Plan.

239.   As a direct and proximate result of their engaging in Prohibited Transactions in violation of ERISA, Covelli, Christian, Etaros, the Covelli Entities, and JTR, each caused the Pension Plan to suffer losses of at least $32 million in connection with the LT Funding Transaction.

240.   For their engagement in Prohibited Transactions, PBGC requests that Covelli, Christian, Etaros, and the Covelli Entities, each be required to disgorge all commissions, fees, and other financial benefits that they earned, received, or obtained as a result of engaging in the Prohibited Transactions.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, PBGC, as statutory trustee of the Pension Plan, respectfully requests that the Court take the following actions:

A.   Enter judgment in favor of Plaintiff PBGC and against Defendants Kushner and Spitz on each of Counts I, II, III, IV, V, VI, VII, VIII, IX, XI, XII, XIII, XIV, and XV, for their violations of 29 U.S.C. §§ 1104 and 1106, and pursuant to their liability under 29 U.S.C. §§ 1105 and 1109, for:

(a) losses suffered by the Pension Plan, including, but not limited to, the increase in the Minimum Funding Obligations that would have been due if the Annual Reports did not overstate the fair market value of the combined assets of the Pension Plan,

(b) pre- and post-judgment interest,

(c) lost opportunity costs,

(d) lost profits,

(e) disgorgement and surcharge,

(f) an accounting,

(g) imposition of a constructive trust,

(h) restitution, and

(i) any other and further relief as the Court deems just and proper, compelling the Defendants Kushner and Spitz, and each of them, to disgorge and restore to the Pension Plan, with interest, the value of all profits and other financial benefits Defendants Kushner and Spitz have earned, received, or obtained through improper use of the Pension Plan's assets, pursuant to their liability under 29 U.S.C. §§ 1105 and 1109.

B.      Enter Judgement in favor of Plaintiff PBGC and against Defendant Richard J. Covelli on each of Counts IX and X for disgorgement of all fees, including but not limited to the JTR Subordination Fee, commissions, and other financial benefits that he earned, received, or obtained as a result of engaging in the Knowing Participation in a Breach of Fiduciary Duties in violation of 29 U.S.C. § 502(a)(3), disgorgement of any profits earned on such fees, commissions, and other financial benefits, and any other appropriate equitable relief.

C.      Enter Judgement in favor of PBGC and against Defendants Richard J. Covelli,  Traci M. Christian, JTR, LLC, C & C Marketing , LLC, C2 Advisors, LLC, Etaros Actuarial Services, LLC on each of Counts XVI  and XVII for disgorgement of all fees, commissions, and other financial benefits that they earned, received, or obtained as a result of engaging in the Prohibited Transactions in violation of 29 U.S.C. § 1106, disgorgement of any profits earned on such fees and other financial benefits, and any other appropriate equitable relief.

D.      Award PBGC all its costs of litigation in this case pursuant to 29 U.S.C. §§ 1132(g) and 1303(e)(5); and

Award PBGC such other and further relief as the Court deems just and proper.

Dated:  February 14, 2019                    Respectfully Submitted,


                                             s/ Jordan E. Jacobson___
                                             JUDITH STARR
                                             General Counsel
                                             CHARLES L. FINKE
                                             Deputy General Counsel
                                             JOEL W. RUDERMAN
                                             KENNETH J. COOPER
                                             Assistant General Counsel
                                             MARK R. SNYDER (CA 109430)
                                             MARY A. PETROVIC
                                             JORDAN E. JACOBSON (CA 302543)
                                             Attorneys

PENSION BENEFIT GUARANTY
CORPORATION
Office of the General Counsel
1200 K Street, N.W.
Washington, D.C. 20005-4026
Tel.: (202) 326-4020, ext. 6511
Fax: (202) 326-4112
Emails: jacobson.jordan@pbgc.gov *and*
            efile@pbgc.gov

Attorneys for Pension Benefit Guaranty
Corporation